1  **ROGER GORDON**
**407 K STREET NE**
2  **WASHINGTON DC 20002-3523**
**TELEPHONE: (202) 674-8313**
3  **E-MAIL: ROGERNGORDON@GMAIL.COM**

**FILED**

JUL 1 0 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing

4

5  **PRO SE**

6

7

8  ### UNITED STATES DISTRICT COURT

9  ### NORTHERN DISTRICT OF CALIFORNIA

**SI**

10

11  **ROGER GORDON**
**407 K STREET NE**
12  **WASHINGTON DC 20002-3523**

13  **Plaintiff,**

14

15  **v.**

16  **STATE BAR OF CALIFORNIA**
**COMMITTEE ON BAR EXAMINERS**

17

18  **180 Howard Street**
**San Francisco, CA 94105**
19  **415-538-2000**

20  **Defendant**

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.

CV 08 3341

**CIVIL RIGHTS COMPLAINT AGAINST THE STATE BAR OF CALIFORNIA FOR VIOLATIONS OF THE FIRST, FIFTH, TENTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION; AND FOR INJUNCTIVE RELIEF**

21

22

23

24

25

26

27

28

Dated this 8th day of July, 2008

_____
407 K Street, NE
Washington, DC 20002-3523
Roger Gordon (Pro se)

## Statement of the Case

1. Plaintiff is a third-year law student in good standing at Georgetown University Law Center, a school accredited by the American Bar Association ("ABA"). [1] He is six units short of graduating. Plaintiff's goal in filing this suit is three-fold. He seeks to establish:

2. (a) His right to prepare for the California bar examination by utilizing both accredited study and alternative means of preparation, i.e., unaccredited study or reading for the bar.

3. (b) His right to sit for the bar exam before completing his upper division studies; and

4. (c) His right to sit for the bar exam without fulfilling his law school's graduation requirements that are unrelated to subjects covered on the bar exam.

5. This Complaint first argues that the proper standard of review for bar admission rules is strict scrutiny, not rational basis review. Second, it contends that California's bar admissions rules violate the Fourteenth Amendment's equal protection guarantees by establishing different requirements for "traditional" and "alternative" upper division law students. Third, the State Bar's requirement that students must graduate from law school before taking the bar exam violates the Constitution's equal protection and due process guarantees. Finally, it is argued that by universally adopting the ABA's accredited degree requirements, the states have established a national regulatory scheme that impermissibly burdens interstate commerce and intrudes upon federal interests.

6. Plaintiff hopes that a successful challenge will lower the financial and opportunity costs of obtaining a legal education. This would reduce both barriers to entry to the profession and would reduce the pressure on new lawyers to practice in corporate law firms in order to

---

[1] See Exhibit A: Biography of Plaintiff

service their law school debts, even when their professional interests lay elsewhere. This would have the desirable effect of enabling more lawyers to be able to afford to represent a broader range of clients.

## Jurisdiction

7. This Court has jurisdiction over Plaintiff's federal civil rights claims under 28 U.S.C. § 1331 because the matters in controversy arise under the Constitution and laws of the United States; also:

8. In District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 486 (1983), the United States Supreme Court held that "District Courts ... have subject matter jurisdiction over general challenges to state bar rules, promulgated by state courts in non-judicial proceedings, which do not require review of a final state court judgment in a particular case." Such is the case here. Therefore, this court has jurisdiction to hear a constitutional challenge to California's bar rules.

## Plaintiff

9. Plaintiff ROGER GORDON is six units short of receiving his Juris Doctor degree from Georgetown. He has requested, and been denied, a certificate from his law school declaring that he has received sufficient preparation to take the California bar exam. He also has been denied permission from the State Bar of California to sit for the exam prior to graduating.

## Standard of Review

10. **California's bar admissions rules should be subject to strict scrutiny because they restrict fundamental rights, limit access to the courts, and disparately impact protected classes.**

Complaint Against State Bar of CA for Var. Const. Violations - 3

11. Bar admissions rules nominally are subject to rational basis review.[2] Procedural law is the purview of the judicial branch. Admission to the bar is controlled in each state by rules established by its highest court.

12. Although the United States Constitution does not declare a right to practice law, the Supreme Court, in Supreme Court of New Hampshire v. Piper, 470 U.S. 274, 281-83 (1985), held that law practice is protected by the Privileges and Immunities Clause of the U.S. Constitution. However, because the state has an interest in ensuring the high quality of the legal profession, it may regulate both legal education and practice.[3]

13. The Supreme Court appears to share the view that bar admissions rules should be subject to higher than rational basis review. In Piper, the Court tested a New Hampshire law requiring members of the bar to be state residents for "substantiality" and a "close relationship to [the State's] objectives."[4] In reaching its decision, the Court specifically rejected the suggestion that it narrowly apply "less restrictive means" analysis, which is an element of strict, not rational basis, scrutiny.[5] In Frazier v. Heebe, the Supreme Court overturned a federal district court's state residency requirement, ruling that bar admissions rules must be consistent with the "principles of right and justice."[6]

---

[2]  Schware v. Committee on Bar Exam. of State of N.M., 353 U.S. 232, 239 (1957)
[3]  Goldfarb v. Virginia State Bar, 421 U.S. 773, 792 (1975) ("[A] state may regulate an occupation which affects the public interest by setting qualifications reasonably related to competency."). See also, Potter v. New Jersey Supreme Court (403 F.Supp. 1036, 1037 (D.C.N.J. 1975) (a state may regulate admission to legal practice and establish qualifications for taking its bar exam)
[4]  Piper at 285 and 287
[5]  Id. at footnote 17
[6]  482 U.S. 641, 645 (1987) quoting In re Ruffalo, 390 U.S. 544, 554 (1968) (White, J., concurring) (internal punctuation omitted)

14. More recently, in Mothershed v. Justices of the Supreme Court, 410 F.3d 602 (9th Cir. 2005), this circuit applied heightened scrutiny to the State of Arizona's bar admissions rules by requiring them to be "narrowly tailored to serve a significant governmental interest" and that "alternative channels" [for securing legal representation] ... be available to the public."[7]

15. The Supreme Court observed, in Goldfarb v. Virginia State Bar, 421 U.S. 773, 792 (1975), that lawyers are "essential to the primary governmental function of administering justice." On that basis, it struck down a price-fixing scheme perpetrated by that state's bar association. This implies that inequities in the regulatory scheme governing the bar also undermine the courts' "primary governmental function of administering justice."[8] This compels the courts to review their own rules by the highest standard. Any other policy would risk failing to reach the merits of a challenge to the procedures themselves.[9]

16. Because bar admissions rules are drafted by the legislature and signed by the governor before being adopted by the California Supreme Court, a non-court challenge to judicial branch rules must begin with a petition to the legislative branch. This implicates separation of powers principles and the judicial branch's supremacy within its sphere.

17. The equal protection clause of the Fourteenth Amendment directs the courts to allow every person access to them. The courts, therefore, have an affirmative obligation to eliminate unnecessary barriers. Rules that make legal education, practice and representation harder to achieve fall into this category, if they cannot be justified. The need for the Thirteenth and

---

[7] Mothershed at 611

[8] Goldfarb at 792

[9] Accord Piper at footnote 17 (less restrictive means analysis has a limited role in the privileges and immunities context and state may be required to achieve its legitimate goals without unnecessary discrimination)

Fourteenth Amendments, despite the existence of the Fifth Amendment's ostensibly universal due process and equal protection guarantees, illustrates the consequences of any other policy.

18. *The Non-Delegation Doctrine, the Chenery Doctrine and the Accardi Principle require the State Bar to justify its rules*

19. In Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 472 (2001), the Supreme Court held that administrative rulemaking must adhere to an "intelligible principle" articulated by the delegating authority.[10] Although that case dealt with a legislative delegation of authority to an executive branch agency, its principle should be applied to judicial delegations as well because a delegation of authority by any branch implicates separation of powers principles.

20. In S.E.C. v. Chenery Corp., 318 U.S. 80, 95 (1943), the Court held that "an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained." In United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260 (1954), the Court further established that administrative agencies must comply with their own regulations. Yet, despite numerous State Bar directives to increase the accessibility and diversity of the profession, the Committee on Bar Examiners continues to enforce ABA accreditation standards that needlessly raise the cost of legal education.

21. Nowhere does the Board of Examiners describe what legal preparation is required to graduate or to take the bar exam, except by reference to the ABA's rules. The California Supreme Court's complete reliance upon the State Bar's Committee on Bar Examiners to set bar admissions requirements, and the Committee's blind reliance in turn upon the ABA to set

---

[10] Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 472 (2001) (quoting J.W. Hampton, Jr., & Co. v. U.S., 276 U.S. 394, 409 (1928))

education and graduation requirements, are unlawful delegations of critical rulemaking authority.

22. Administrative rules that put statutorily permissible methods of satisfying a requirement at a disadvantage should be suspect. The California Supreme Court has never held that reading for the bar is an unsound or inferior method of training for the bar. Nevertheless, the Committee on Bar Examiners imposes requirements on bar readers that make it an unattractive, or even impossible, option for prospective lawyers. These requirements include an additional year of study, limiting instruction to normal business hours, and a maximum student-teacher ratio of two-to-one.[11] These onerous requirements have significantly undermined reading for the bar as a pathway into the profession. Of the 13,318 individuals who sat for the California bar exam in 2007, only six prepared by reading for the bar.[12]

23. The burden should be on the Committee on Bar Examiners to prove compliance with the California Supreme Court's directives and to demonstrate its *ex ante* rationales for the rules it has promulgated.

24. *The courts should subject bar admissions requirements predicated upon the ABA's rules to the highest level of scrutiny because those institutions unlawfully collude in violation of the Sherman Act.*

---

[11] See, generally, Rule VII, Section 3, Rules Regulating Admission to Practice Law in California (as Amended to July 20, 2007) available at http://calbar.ca.gov (last visited June 20, 2008) (hereinafter referred to as California Admission Rules)

[12] Source: National Conference of Bar Examiners 2007 Statistics, available at http://www.ncbex.org/bar-admissions/stats/ (last visited June 20, 2008).

25. The graduation requirements of ABA-accredited law schools are determined entirely by the American Bar Association through its accreditation standards.[13] So complete is the Committee on Bar Examiners' reliance upon the ABA to establish those standards, that were the ABA to change its rules to allow accredited law schools to award Juris Doctor degrees with less than three years of study, the state bar law would not need to modify any of its regulations to accommodate that change. This agency-like relationship compels the courts to examine the ABA's accreditation regime by the standards it applies to its own rules of administration.

26. Numerous observers have commented upon, and successful action against the ABA by the Antitrust Division of United States Department of Justice establishes, the anticompetitive nature of the American Bar Association and its harmful effects on legal education.[14] Furthermore, the courts have found that law professors unlawfully colluded with bar preparatory course providers by agreeing not to work for their competitors, and several universities that operate law schools (including Georgetown University) have been investigated by the New York State Attorney General's Office as part of its investigation into hidden deals between student loan providers and schools.[15]

---

[13] See ABA Section of Legal Education and Admission to the Bar, Chapter 3: Program of Legal Education, available at: http://www.abanet.org/legaled/standards/standards.html (last visited June 20, 2008).

[14] See, U.S. v. American Bar Association, Antitrust Case Filings, Antitrust Division, U.S. Department of Justice, available at http://www.usdoj.gov/atr/cases/americ1.htm (last visited June 20, 2008).

[15] See, "Cuomo Expands College Loan Investigation," Press release dated August 1, 2007 (avail. at http://www.oag.state.ny.us/press/2007/aug/aug1a_07.html) (last visited July 8, 2008)

27. In light of the ABA's history of anticompetitive activity, the courts should closely scrutinize the rules it has promulgated before adopting them as their own. Any unexplained rulemaking that incorporates or enforces the ABA's standards should be especially worrisome.

28. *Because time, place and manner restrictions on the exercise of fundamental rights and privileges implicate First Amendment associational rights, the court should subject bar admissions rules to more than rational basis scrutiny.*

29. In Mothershed, this circuit held that First Amendment rights are implicated when the state limits a citizen's ability to consult with a lawyer of his or her choice.[16] Time, place, and manner restrictions on law practice, the court held, are reasonable only if they are "narrowly tailored" and if "ample alternative[s]" are available.[17]

30. The courts also should take care not to become complicit in perpetuating the legal profession's long history of discriminatory and self-serving bar admissions rules. The courts have struck down numerous legal education and bar association rules and practices that were long defended on the grounds of quality, integrity, tradition, and even morale. These include laws that either explicitly or implicitly limited access to practice on the basis of gender, race, citizenship, part-time study, sexual orientation, mental health history, arrest record, length of state residency, and political affiliation.[18]

31. Cost and efficiency cannot legitimize laws that impact fundamental rights and limit access to the courts. The Supreme Court held, in Gratz v. Bollinger, that "[t]he fact that the

---

[16] See Mothershed, 410 F.3d 612 (upholding restrictions on First Amendment rights because of availability of alternatives).

[17] Id.

[18] See, generally, Richard L. Abel, American Lawyers (1989) and Robert Stevens, Law School: Legal Education in America from the 1850s to the 1980s (1983).

1    implementation of a program capable of providing individualized consideration might

2    present administrative challenges does not render constitutional an otherwise problematic

3    system."[19] In Stanley v. Illinois, it held that, "The establishment of prompt efficacious

4    procedures to achieve legitimate state ends is a proper state interest worthy of cognizance in

5    constitutional adjudication. But the Constitution recognizes higher values than speed and

6    efficiency."[20] Accordingly, a discriminatory bar admissions scheme cannot be justified by

7    administrative convenience and expense.[21]

8

9    32. Rules that promote efficiency are likely to disparately impact individuals who share

10   characteristics that limit efficiency, e.g., financial and physical limitations. The court should

11   therefore carefully weigh concerns of judicial economy against its obligations to the public

12   and to the profession when it adopts procedural rules.

13

14   33. California's bar admissions rules impact individuals with disabilities, e.g., the blind and those

15   with learning disorders, disproportionately because the rigidity and expense of its preferred

16   education model, i.e., the ABA's, limits the extent to which their conditions can be

17   accommodated.

18

19   34. The large number of students who develop emotional and substance abuse disorders during

20   or soon after law school also should be regarded as members of this class because of the

21   likelihood that the structure, demands, and cost of law school play causative or exacerbating

22   roles in their conditions.

23

24   _____

[19] Gratz v. Bollinger, 539 U.S. 244, 247 (2003)

25   [20] Stanley v. Illinois, 405 U.S. 645, 656 (1972). See also Frontiero v. Richardson, 411 U.S. 677,
26   690 (1973) ("[W]hen we enter the realm of 'strict judicial scrutiny,' there can be no doubt that
     'administrative convenience' is not a shibboleth, the mere recitation of which dictates
27   constitutionality.")

28   [21] See Muller v. Costello, 187 F.3d 298 (2d Cir. 1999)

Complaint Against State Bar of CA for Var. Const. Violations - 10

35. *State bar rules should be reviewed by higher than the rational basis standard because they intrude upon federal interests and undermine the Constitution's division of powers between the states and the federal government.*

36. The absence of a federal bar exam leads federal courts to rely heavily upon state bar admissions decisions for admitting attorneys to their bars.[22] State courts and bar examiners, therefore, effectively control access to the federal courts, even in exclusively federal areas of practice such as admiralty, bankruptcy, and copyright law.[23]

37. Federal courts owe no deference to state legislatures. A primary rationale for the Supremacy Clause, which applies to all branches, is to avoid state rulemaking that complicates or inhibits important federal functions. If the federal judiciary must rely upon state bar admissions procedures, it should establish its own minimum standards and review state laws against them by a higher standard than rational basis. This is because rational basis review is intended to permit elected legislatures broad discretion. In this case, however, state legislatures and state courts are exercising discretion in federal judicial arenas. The resulting panoply of rules creates the likelihood of equal protection violations.

38. For these reasons, the court should subject California's bar admissions rules to the highest level of scrutiny to ensure they are narrowly tailored and the least restrictive means possible for protecting legitimate, specific, and compelling government interests.

## The Existing Statutory Framework

39. The courts may regulate legal education and admission to practice to protect the state's interest in a well-educated bar. The bar exam is the state's primary mechanism for protecting

---

[22] Matter of Roberts, 682 F.2d 105, 108 (C.A.N.J., 1982)

[23] See Florida patent case

that interest. California imposes a legal training prerequisite on bar challengers that may be satisfied through either traditional or alternative study.

40. The traditional method entails three years of study at a law school accredited by the ABA or approved by the Committee on Bar Examiners. The alternative method has two tracks: Four years of study at school that is neither accredited by the ABA nor approved by the Committee, or four years of study under the supervision of a judge or practitioner (also referred to as "reading" for the bar).[24]

41. Traditional preparers must acquire a total of 967 hours of in-class instruction.[25] Students at unaccredited schools must acquire 1,080 hours of training.[26] Those who read for the bar must study for 960 hours.[27] Alternative preparers may not accelerate their studies in order to graduate in less than four years.[28] Alternative preparers may combine the two forms of alternative study but traditional students may only study at accredited schools.[29]

42. A student at an accredited school may seek to have his or her studies applied toward the requirements for alternative study. However, not only would all of his or her accredited studies be reassessed against the standards for alternative preparation, but the four-year minimum study requirement would still be enforced, regardless of how much accredited instruction he or she had already received. In Plaintiff's case, this would result in a 12-month

---

[24] CA ST Bus. & Prof. § 6060(e)

[25] ABA Accreditation Standards, Chapter 3, Program of Legal Education, Standard 304(b) (requiring a minimum of 58,000 minutes of classroom instruction) available at http://www.abanet.org/legaled.html (last visited June 20, 2008)

[26] CA ST Bus. & Prof. § 6060(e)(2)(A)

[27] Rule VII, Section 3.

[28] CA ST Bus. & Prof. § 6060(e)(2)

[29] See CA ST Bus. & Prof. § 6060(e)(2)(E) (permitting preparers to utilize any combination of alternative methods but making no reference to combining alternative studies with study at an ABA-accredited law school).

waiting period after he completed six units of study, before he would be eligible even to apply to take the bar exam.

## Arguments

43. **Establishing different requirements for traditional and alternative upper division students violates their Equal Protection rights because they are similarly situated.[30]**

44. California requires alternative preparers to pass a "First Year Law Student Examination" (FYLSX) after their first year of study and before they may receive credit for the remaining three years of study.[31] The exam covers subjects common to the first-year curricula of accredited schools and is intended to weed out students who are unlikely to pass the bar exam.[32] Students who are promoted to the upper division of an ABA-accredited program are exempt from taking the exam.

45. After students either pass or become exempt from the FYLSX, California makes no further effort to evaluate them before the actual bar exam. They may go on to complete their studies and challenge the bar without further testing. The fact that the state does not find it necessary to test alternative preparers at the end of their second or third years, or to test traditional students after their second year, indicates that their method of upper division study is not of concern to the state.

46. The FYLSX, therefore, is an equivalency exam and alternative preparers who pass it are similarly situated to students at accredited law schools who pass their first-year classes.

---

[30] "Lower division" refers to first-year study; "Upper division" refers to study beyond that.
[31] CA ST Bus. & Prof. § 6060(h)
[32] Lupert v. California State Bar, 761 F.2d 1325, 1328 (9th Cir. 1985)

47. An analysis of the characteristics of lower- and upper-division study reveals why this conclusion makes sense: After the first year of law school, there is no significantly competitive admissions process, there is almost no academic attrition, and students may enroll in internship and clinical programs, transfer to or visit other schools, and even study abroad. The primary quality assurance functions that law schools perform for the courts, i.e., the admissions process and testing that leads to academic attrition, are substantially complete after the first year.[33]

48. Because first year preparation is pedagogically distinct from upper division preparation and can be independently evaluated, students who pass the FYLSX, or who become exempt from it, should be able to employ either or both traditional and alternative methods for their upper division preparation.

49. Nevertheless, the ABA prohibits accredited law schools from granting credit for classes taken prior to a student's matriculation at an accredited school. It also severely limits credit for non-classroom-based study and prohibits schools from establishing degree programs other than the three-year J.D. without its permission.

50. Substantive differences between forms of education can justify different treatment for students who prepare differently. However, all classifications must be meaningful and reflect relevant underlying differences between classes or individuals. Because the imposition of an additional year of study significantly inflates the financial and opportunity costs of legal

---

[33] Academic attrition at accredited schools in 2007 was 3.7% in Year 1, 0.9% in Year 2, and 0.3% in Year 3. Source: ABA Section of Legal Education and Admission to the Bar, "Official Guide to ABA-approved Law Schools" 2008 Edition Right Page Data set available at: http://www.abanet.org/legaled/statistics/stats.html. (last visited June 20, 2008)

education, and thereby reduces access to the legal profession, the courts must justify the additional requirements it imposes on alternative preparers.

51. Requiring alternative preparers to study for an additional year cannot be justified on pedagogical grounds. First, imposing the FYLSX on alternative preparers after their first year of alternative study, and waiving it for traditional students after their first year of study, implies that their learning rates during the first year of law school, which is widely accepted to be the most difficult, are the same. Second, the entire four-year course of study required of students in unaccredited schools results in only 113 more hours of classroom instruction than accredited students receive in three years. For bar readers, the statute requires seven *fewer* hours than what accredited students must receive.

52. *Because California's requirements for upper division alternative students are different and more onerous than those for similarly situated upper division traditional students, it violates the equal protection guarantees of the Fourteenth Amendment.*

53. Imposing more onerous requirements on alternative preparers bears an unsettling resemblance to past discrimination perpetrated in the first half of the last century by the American Bar Association when it withheld accreditation from evening law schools, claiming they undermined the quality of the profession. The courts eventually found no relationship between the ABA's rules, their putative goals, and the state's interests. Rather, legal historians have concluded the restrictions were designed to prevent "undesirables" such as African Americans, Jews, and other immigrants, who were less wealthy and could not afford to study full-time, from entering the profession.

54. Because legal knowledge can be acquired in a variety of forums without undermining the state's ability to protect its interests through testing, bar association policies that prevent students from utilizing all permissible methods of preparing for the bar are improper.

***

55. **Denying students who have completed their lower division studies the opportunity to challenge the bar exam violates their right to be free from arbitrary requirements because upper division study will not increase their level of preparedness for the exam.**

56. The bar exam does not test upper division learning and bar examiners neither require enrollment in nor test subjects taught beyond the first year of law school. Nevertheless, they require prospective lawyers to complete three or four years of law school before challenging the bar.

57. Bar examiners claim the graduation requirement for taking the bar is protective of four state interests: A) that legal training that will be tested on the exam has been acquired; B) that testing or grading errors do not result in an unqualified person passing the bar and being admitted to practice; C) that law school graduation requirements, unrelated to the bar exam, have been are met; and D) that training that is delivered in law school, but which cannot be tested on the bar exam, has been acquired.

58. A) The graduation requirement does not ensure that legal training tested on the bar exam has been acquired. Every law school's first-year curriculum is comprised almost entirely of the same required courses. Conversely, their upper division curricula are almost entirely elective.[34] Because no two law students enroll in the same upper division courses, every

---

[34] Id.

person who sits for the bar has been uniquely prepared for it after his or her first year of law school. Whatever the rationale for the three-year study requirement might be, it cannot be related to the contents of the bar examination. Accordingly, the bar primarily tests first-year subjects.

59. Enrollment in those upper division subjects the bar does test is not required to graduate or to take the bar and so students often do not study them in school. Rather, they rely on self-study or private bar review courses to learn them for the first time after they graduate. At least one study has confirmed that performance on the bar exam is not correlated with a student's choice of upper division courses.[35]

60. B) <u>Testing or grading errors that could result in unqualified persons being admitted to the bar are highly unlikely.</u> Although it is possible that the graduation requirement protects against an unqualified person somehow passing the bar exam, the highly analytical and challenging nature of the exam, its significant essay component, and its review by multiple experienced readers, makes this type of error highly unlikely. The bar application process itself ensures that challengers have received formal legal education.

61. C) <u>Using the bar exam to enforce non-academic graduation requirements is improper.</u> Although the graduation requirement does ensure that a level of academic training has been received, law schools impose additional requirements unrelated to academic preparation. If they are to be permitted to tie their requirements to the state's, they should be required to

---

[35] "There [i]s no statistically significant relationship between the number of upper division, bar examination subject-matter courses taken and bar examination passage for graduates who ranked in the first, second, or fourth quartiles or for graduates who ranked in the bottom 10 percent of their graduating class." Douglas K. Rush and Hisako Matsuo, "Does Law School Curriculum Affect Examination Passage?" 57 J. Legal Educ. 224, 233 (2007).

demonstrate that such additional requirements also are necessary to protect legitimate and compelling state interests.

62. *The proper standard for reviewing law school graduation requirements is the same standard the court applies to its own rules.*

63. Except for the bar application process and the exam itself, the California Supreme Court relies upon law schools to administer every component of its bar admissions regime. (Even character and fitness requirements are pre-vetted through the law school admissions process.) The agency-like nature of that relationship suggests that the same level of review should be applied to law school regulations as the court applies to its own rules of procedure.

64. The courts should not conflate law schools' interests with those of the state. The Supreme Court made this clear in Grutter v. Bollinger. [36] Ruling on the constitutionality of the University of Michigan Law School's admissions rules, the Court cited its "tradition of giving a degree of deference to a university's academic decisions, *within constitutionally prescribed limits*," but nevertheless held that its "scrutiny of the interest asserted by the Law School [would be] no less strict."[37]

65. Among the requirements that law schools (and the ABA) have improperly grafted onto the State Bar's admission rules are ones pertaining to: i) pre-matriculation study; ii) resident study; and iii) financial obligations.

66. i) As noted, *supra*, the ABA prohibits accredited law schools from granting credit for classes taken prior to being admitted to a law school its accredits. This raises important First

---

[36] Grutter v. Bollinger, 539 U.S. 306 (2003)

[37] Id. at 328 (emphasis added)

Amendment associational concerns because, as discussed *supra*, the FYLSX already protects the state's interest in ensuring that lower division preparation has been achieved. Once a student passes the FYLSX, that concern is satisfied and the state has no basis for dictating the time, place or manner of his or her remaining studies.

67. ii) Rules limiting the transfer of credits between accredited schools also bear no relationship to any legitimate state interest and can give rise to absurd results. Under the ABA's rules, it is possible for a student to successfully complete a full course of study divided between two accredited schools but, because of resident study requirements, be ineligible to graduate from either one.

68. The claim that minimum resident study is required to adequately supervise and evaluate students is undermined by the ABA's accreditation regime itself, which establishes common standards and facilitates comparisons.

69. iii) A school may deny a student a diploma, and thus the opportunity to challenge the bar, for failure to pay tuition or fees. This supposedly protects the state's interest in the health of its academic institutions. However, enforcing private obligations by limiting the exercise of a privilege of citizenship is neither proper nor necessary. Not only are accredited law schools financially robust institutions, but other prophylactics and remedies for default exist, beginning with the schools' own admissions standards. When a default results from a deficiency in character, the state is protected by the character and fitness component of the bar application process, which schools have significant influence over.

70. Finally, because passing the bar and commencing law practice are positively correlated with income, preventing financially delinquent but otherwise qualified students from challenging the bar actually harms schools' interests.

71. D) The graduation requirement cannot be related to legal training *not* tested on the exam. It might be argued that limiting the bar exam to law school graduates ensures that challengers have received legal training that is not, or cannot, be tested on the bar exam, but which the state has an interest in their having received. This is impermissible because logic and due process require that a legitimate pre-condition for the exercise of a privilege of citizenship must be: i) explicitly stated as such; ii) logically related to the privilege; iii) described in sufficient detail to allow compliance; and iv) necessitated by the infeasibility of a direct requirement. The argument that "something" happens in the upper division of law school, which can only happen in law school, but cannot be tested, fails on all four counts.

72. i) The courts have never held, and examiners have never explicitly stated, that the graduation requirement ensures that bar challengers have received training that will *not* be tested on the exam. To the contrary, the courts simply have held that graduation ensures that adequate preparation for the bar exam has been received. As discussed, *supra*, because enrollment in courses tested on the bar exam is not required to graduate from law school or to take the bar exam, even this premise fails to hold water.

73. ii) An exam can only be related to the things it tests. As discussed, *supra*, every challenger is uniquely prepared for the bar because every upper division class is an elective. Thus, linking the right to take the bar exam with the completion of a set amount of unspecified coursework fails the test of relatedness.

74. The courts have struck down numerous laws linking the exercise of rights the state wishes to but may not legitimately control to seemingly less-proscriptive requirements, e.g., voting rights to literacy. As with those laws, the rule linking graduation from an ABA accredited law school with the right to challenge the bar exam is pretextual and not protective of the state's interests.

75. iii) The upper division study requirement has not been described in sufficient detail to allow meaningful compliance. In fact, it has not been described in any detail at all. As discussed, *supra*, the mere recitation of a graduation requirement, the terms of which are controlled by a law school, which is in turn controlled by the ABA, is not so much a description as it is a delegation.

76. iv) Requiring challengers to have graduated is not necessary to ensure they have received non-testable training that cannot otherwise be achieved. There is no objective reason to insist that "holistic" preparation take place entirely in or even during law school. Not only are some skills and areas of knowledge likely to be equally or more acquirable outside of law school but, as described, *supra*, many students already acquire them there.

77. Furthermore, the state already accepts non-law school-based training from students who read for the bar. The presumption that students at accredited institutions are better qualified to study the law supports the conclusion that they should be able to employ the same training methods as readers.[38] These disparate regulations directly implicate the Fourteenth Amendment's equal protection guarantee.

---

[38] However, as argued, *supra*, the presumption fails once an alternative preparer passes the FYLSX.

78. *Upper division studies do not result in greater preparedness to challenge the bar exam; students are no more prepared to take the bar after three years of law school than after one. The correlation between the subjects tested on the bar and a student's actual upper division preparation is extremely attenuated and bar examiners are indifferent as to where and how post first-year training is obtained. Therefore, restricting the bar exam to students who have completed their upper division studies violate the Constitution's due process and equal protection guarantees.*

79. **California's adoption of the ABA's accreditation standards and its preferential treatment of schools accredited by it impermissibly burden interstate commerce and violate the Tenth Amendment.**

80. *A state law regulating commerce that applies only to out-of-state actors impermissibly burdens interstate commerce.*

81. Legal education, like law practice, has a substantial impact on interstate commerce.[39]

82. California requires bar challengers to have graduated from a law school that has been accredited by the ABA or approved by its Committee on Bar Examiners. Because the Committee's standards are more lenient, ABA-accreditation for California-based schools is superfluous.

83. The Committee on Bar Examiners does not approve non-California law schools, i.e., it does not allow their graduates to sit for the bar.[40] The practical effect of the ABA-accreditation requirement, therefore, is to require only out-of-state schools to seek ABA accreditation.

---

[39] Piper at 281 ("[T]he practice of law is important to the national economy."); See also, Goldfarb at 788 ("[I]t cannot be denied that the activities of lawyers play an important part in commercial intercourse, and that anticompetitive activities by lawyers may exert a restraint on commerce.")

84. *A state law that has the effect of requiring another state to adopt its standards burdens interstate commerce.*

85. Although only 10% of ABA-accredited law schools are in California, the state controls a significant share of the market for new lawyers.[41] In 2007, 16% of all test takers nationwide took the California bar and nearly 24% of California's bar challengers that year were educated at ABA-accredited law schools outside the state.[42]

86. A law school that chose not to seek ABA-accreditation would be at a significant disadvantage because its graduates would not be allowed to take the California bar. Thus, California's ABA accreditation requirement forces other states either to adopt the ABA standard entirely or to implement two-tiered accreditation systems in which their own accreditation standards would be subordinate, regardless of how rigorous they might be.

87. *The universal adoption by the states of a single national accreditation scheme burdens interstate commerce because it limits the ability of any one state to adopt its own standards.*

88. In Healy v. Beer Institute, Inc., the Supreme Court held that "the practical effect of [a] statute must be evaluated not only by considering the consequences of the statute itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of

---

[40] State Bar reports reveal that the February 1999 administration of the bar exam was the last time a graduate of an out-of-state law school that was not approved by the ABA was permitted to sit for it.

[41] Source: ABA Section of Legal Education and Admission to the Bar (available at http://www.abanet.org/legaled/approvedlawschools/approved.html) (last visited July 3, 2008)

[42] Source: General Statistics Reports, February 1997 through July 2007, California Committee on Bar Examiners; available at http://www.calbar.ca.gov. (last visited July 3, 2008)

1     other States and what effect would arise if not one, but many, or every, State adopted similar

2     legislation."[43]

3 89. The practical effect of the universal adoption by the states of the ABA standard is an

4
5     interlocking set of regulations that inhibits independent lawmaking by any one state. This is

6     an impermissible burden on interstate commerce.

7 90. *A state law regulating in-state production intended for export burdens interstate commerce.*

8
9 91. The ABA prohibits accredited law schools from issuing any type of law degree other than a

10     Juris Doctor in preparation for the bar. The State of California, which is a major exporter of

11     law school graduates, endorses that prohibition by licensing schools only to issue Juris

12     Doctor degrees and by giving preferential treatment to ABA-accredited schools and their

13     graduates.

14
15 92. In Lemke v. Farmers' Grain, the Supreme Court considered the constitutionality of a state law

16     regulating a North Dakota grain cooperative's shipments to Minnesota.[44] Although it

17     acknowledged that some of the grain might find its way back into the in-state market,

18
19     because the transactions at issue concerned grain intended for the Minnesota market, North

20     Dakota's restrictions were found to burden interstate commerce.

21 93. As established, *supra*, California-based law schools must seek ABA accreditation only to

22     secure access for their graduates to the bar exams of other states. Therefore, seeking

23
24     accreditation indicates the intent to export, just as attending an accredited school must give

25     rise to the strong presumption (irrefutable in the aggregate) that a student intends to practice

26     out-of-state. Rules, therefore, that have the effect of requiring or encouraging schools to seek

27     [43] Healy v. Beer Institute, Inc., 491 U.S. 324, 336 (1989)

28     [44] Lemke v. Farmers' Grain Co. of Embden, N.D., 258 U.S. 50 (1922)

ABA-accreditation, regulate the education of students who intend to practice out of state and interstate commerce.

PRAYER FOR RELIEF

94. Plaintiff asks the court to enjoin the State Bar of California from enforcing its rules that:

95. (a) Require prospective lawyers to choose between the traditional and alternative methods of preparing for the California bar examination exclusively;

96. (b) Establish requirements for alternative upper division study that exceed those for traditional upper division study;

97. (c) Prevent students from sitting for the bar exam before competing their upper division studies;

98. (d) Enforce law school graduation requirements unrelated to the bar exam;

99. (e) Require out-of-state student applicants to have graduated from an ABA-accredited law school in order to take the bar exam;

100.    (f) Prohibit law schools from issuing law degrees other than the J.D. for non-California bar exams.

101.    (g) Permit law schools to deny students credit for studies completed prior to their matriculation at an ABA-accredited law school if they have passed the FYSLX; and

102.    (h) Permit law schools to require students to complete, or to agree to complete, a three-year course of study of preparation for the bar exam as a condition of enrollment or to obtain a degree or certificate of preparation for the bar.

REQUEST FOR JURY TRIAL

103.    A jury trial is requested.

## EXHIBIT A

## BIOGRAPHY OF PLAINTIFF

Roger Gordon, 40, is a third-year law student in good standing at Georgetown University Law Center in Washington, D.C. He has clerked for the United States Attorney's Office for the District of Columbia (Narcotics & Organized Crime Division), the Center for American Progress, and the U.S. House of Representatives Committee on the Judiciary. Roger received his M.B.A. from Northwestern University's Kellogg School of Management in 1997 and earned his undergraduate degree from Boston University in 1988.

Roger has made a career out of fighting for change, beginning in college, where he interned as a Complaint Mediator in the Consumer Protection Division of the Massachusetts State Attorney's Office and where he became an Emergency Medical Technician and Red Cross CPR Instructor. His first taste of legal advocacy came shortly after graduation when he interned with the Law Offices of Public Advocates and the Greenlining Coalition.

A few years later, Roger founded the *Minority Law Journal*, a national quarterly publication that focused on equal opportunity in the legal profession. Called "good counsel for minority lawyers" by the *Wall Street Journal*, his editorial advisory board included California Supreme Court Justice Allen E. Broussard (Ret.), Harvard Law School Professor Derrick Bell, and the general counsels of Saturn Corporation and Shell Oil Company. Among those who wrote to express their gratitude for Roger's efforts was future Clinton Administration appointee and

Massachusetts governor, Deval Patrick. In 1996, Gordon licensed the *Journal* to American Lawyer Media, which continues to publish it.

After business school, Roger started a small London-based company that launched the first non-bank ATM in the United Kingdom. The feat garnered the attention of the *Financial Times* because it required challenging the banking industry's monopoly control of the financial payments network before the Mergers & Monopolies Commission (now the Competition Commission).

Before going to law school Roger was the executive director of Urban Solutions, a neighborhood economic development organization and U.S. Small Business Administration partner in San Francisco. There, he designed and implemented Six on Sixth, the first neighborhood revitalization program for the South of Market's blighted Sixth Street Corridor to be funded in nearly 30 years. He also helped over 100 entrepreneurs raise nearly $4 million in financing.

In 2002, Roger ran on a pro-neighborhood/small business ticket in a bid to unseat an incumbent on the San Francisco Board of Supervisors. Although his candidacy, which was endorsed by the *San Francisco Chronicle*, was not successful, his campaign the following year for the San Francisco DCCC was endorsed by civil rights legend Fred Korematsu.

During the campaign, the *San Francisco Chronicle* cited Roger's "moderation, common sense and ... citywide purpose." The *San Francisco Examiner* described him as "articulate, capable and willing to listen," and *The Independent* observed that he was "a first-class idea man with a soft-spoken E.F. Hutton twist: When he speaks, people listen."

In 2004, Roger, who is a naturalized citizen, led the campaign against a local proposition that would have extended the right to vote in San Francisco school board elections to non-citizens with school-aged children. He debated Board of Supervisors President, and future Ralph Nader presidential running mate, Matt Gonzalez for an hour on local NPR radio, arguing that the measure reduced immigrants' incentive to become citizens and promoted self-interest at the expense of the social contract.

Roger has served on the board of Big Brothers/Big Sisters of San Francisco and as a Selection Day Judge for the Coro Fellows Program in Public Policy. He also served on the executive board of Human Rights Watch's California Committee North alongside such nationally-prominent attorneys as James Brosnahan (who represented John Walker Lindh) and Jeff Bleich (who, as it happens, currently serves as president of the State Bar of California).

JS 44 (Rev. 12/07) (cand rev 1-16-08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON PAGE TWO OF THE FORM.)

## I. (a) PLAINTIFFS

ROGER GORDON
407 K STREET NE, WASHINGTON, DC 20002

**DEFENDANTS**

STATE BAR OF CALIFORNIA COMMITTEE ON BAR EXAMINERS
180 HOWARD STREET, SAN FRANCISCO, CA 94105

**(b)** County of Residence of First Listed Plaintiff
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

(b) DISTRICT OF COLUMBIA

(c) PRO SE

Attorneys (If Known)

08 - 3341 SI

(b) SAN FRANCISCO

(c) ATTORNEY NOT KNOWN

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- [ ] 1 U.S. Government Plaintiff
- [X] 3 Federal Question (U.S. Government Not a Party)
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                          and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated or Principal Place of Business In This State | [ ] 4 | [X] 4 |
| Citizen of Another State | [X] 2 | [ ] 2 | Incorporated and Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 610 Agriculture | [ ] 422 Appeal 28 USC 158 | [ ] 400 State Reapportionment |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 362 Personal Injury— | [ ] 620 Other Food & Drug | [ ] 423 Withdrawal | [ ] 410 Antitrust |
| [ ] 130 Miller Act | [ ] 315 Airplane Product | Med. Malpractice | [ ] 625 Drug Related Seizure | 28 USC 157 | [ ] 430 Banks and Banking |
| [ ] 140 Negotiable Instrument | Liability | [ ] 365 Personal Injury — | of Property 21 USC 881 | | [ ] 450 Commerce |
| [ ] 150 Recovery of Overpayment | [ ] 320 Assault, Libel & | Product Liability | [ ] 630 Liquor Laws | **PROPERTY RIGHTS** | [ ] 460 Deportation |
| & Enforcement of Judgment | Slander | [ ] 368 Asbestos Personal | [ ] 640 R.R. & Truck | [ ] 820 Copyrights | [ ] 470 Racketeer Influenced and |
| [ ] 151 Medicare Act | [ ] 330 Federal Employers' | Injury Product | [ ] 650 Airline Regs. | [ ] 830 Patent | Corrupt Organizations |
| [ ] 152 Recovery of Defaulted | Liability | Liability | [ ] 660 Occupational | [ ] 840 Trademark | [ ] 480 Consumer Credit |
| Student Loans | [ ] 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | [ ] 490 Cable/Sat TV |
| (Excl. Veterans) | [ ] 345 Marine Product | [ ] 370 Other Fraud | [ ] 690 Other | | [ ] 810 Selective Service |
| [ ] 153 Recovery of Overpayment | Liability | [ ] 371 Truth in Lending | | **SOCIAL SECURITY** | [ ] 850 Securities/Commodities/ |
| of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 380 Other Personal | **LABOR** | [ ] 861 HIA (1395ff) | Exchange |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle | Property Damage | [ ] 710 Fair Labor Standards | [ ] 862 Black Lung (923) | [ ] 875 Customer Challenge |
| [ ] 190 Other Contract | Product Liability | [ ] 385 Property Damage | Act | [ ] 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| [ ] 195 Contract Product Liability | [ ] 360 Other Personal Injury | Product Liability | [ ] 720 Labor/Mgmt. Relations | [ ] 864 SSID Title XVI | [ ] 890 Other Statutory Actions |
| [ ] 196 Franchise | | | [ ] 730 Labor/Mgmt.Reporting | [ ] 865 RSI (405(g)) | [ ] 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | & Disclosure Act | | [ ] 892 Economic Stabilization Act |
| [ ] 210 Land Condemnation | [ ] 441 Voting | [ ] 510 Motions to Vacate | [ ] 740 Railway Labor Act | **FEDERAL TAX SUITS** | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 442 Employment | Sentence | [ ] 790 Other Labor Litigation | [ ] 870 Taxes (U.S. Plaintiff | [ ] 894 Energy Allocation Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 443 Housing/ | **Habeas Corpus:** | [ ] 791 Empl. Ret. Inc. | or Defendant) | [ ] 895 Freedom of Information |
| [ ] 240 Torts to Land | Accommodations | [ ] 530 General | Security Act | [ ] 871 IRS—Third Party | Act |
| [ ] 245 Tort Product Liability | [ ] 444 Welfare | [ ] 535 Death Penalty | | 26 USC 7609 | [ ] 900 Appeal of Fee |
| [ ] 290 All Other Real Property | [ ] 445 Amer. w/Disabilities — | [ ] 540 Mandamus & Other | **IMMIGRATION** | | Determination |
| | Employment | [ ] 550 Civil Rights | [ ] 462 Naturalization Application | | Under Equal Access |
| | [ ] 446 Amer. w/Disabilities — | [ ] 555 Prison Condition | [ ] 463 Habeas Corpus – | | to Justice |
| | Other | | Alien Detainee | | [X] 950 Constitutionality of |
| | [ ] 440 Other Civil Rights | | [ ] 465 Other Immigration | | State Statutes |
| | | | Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from another district (specify)
- [ ] 6 Multidistrict Litigation
- [ ] 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
THE FIRST, FIFTH, TENTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION
Brief description of cause:
Procedural DP and EP challenges to State Bar rule requiring 3-years of study at ABA accredited law school to take bar.

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
- DEMAND $
- CHECK YES only if demanded in complaint:
- JURY DEMAND: [X] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY

PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE "NOTICE OF RELATED CASE".

## IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2) (PLACE AND "X" IN ONE BOX ONLY)

- [X] SAN FRANCISCO/OAKLAND
- [ ] SAN JOSE

DATE July 8, 2008    SIGNATURE OF ATTORNEY OF RECORD    Roger Gordon